1    Pawn store that you were in?

2        A.    That's correct.

3        Q.    Did Gray Hare actually

4    assume that store?

5        A.    No.

6        Q.    Who did?

7        A.    Kevin Godwin.

8        Q.    Okay.  Now is it your

9    testimony that you believe that all

10   white male managers were paid

11   $30,000.00 a year as store managers

12   as an opening salary?

13           MS. WOODHAM:  Objection.

14       A.    I'm sorry.  What?

15       Q.    (BY MR. MULROY):  Do you

16   believe that all white male managers

17   who were hire as store managers by

18   TitleMax, and I'm talking about all

19   the brands, by TitleMax were paid

20   $30,000.00 to start?

21           MS. WOODHAM:  Objection.

22       A.    I don't know.

23       Q.    (BY MR. MULROY):  Okay.  Do

EXHIBIT
2
(2 OF 2)

1    you believe or do you have an opinion

2    as to whether or not all white male

3    managers, who were hired in your

4    region, were paid $30,000.00 as a

5    starting salary for TitleMax stores?

6         A.    I don't remember.

7         Q.    Is it your testimony that

8    no black male managers were paid

9    $30,000.00 as an initial salary for a

10   TitleMax store?

11            MS. WOODHAM:    Objection.

12        A.    No.

13        Q.    (BY MR. MULROY):    Do you

14   know of TitleMax, black TitleMax

15   managers who, in fact, were paid

16   $30,000.00 as a starting salary?

17        A.    Do I know?

18        Q.    Yeah.

19        A.    Yes.

20        Q.    Who do you know that was

21   paid $30,000.00 as a starting salary

22   that is a black male?

23        A.    Hillard Williams.

```
 1          Q.    I'm sorry?

 2          A.    Hillard Williams.

 3          Q.    And what store did he take?

 4          A.    He took the U.S. store.

 5          Q.    And how do you know that he

 6     got paid $30,000.00?

 7          A.    From the e-mail.

 8          Q.    And when did you learn

 9     that?

10          A.    I don't remember the date.

11          Q.    But it was before you filed

12     the lawsuit?

13          A.    Yes.

14          Q.    And it was before you filed

15     your EEOC charge?

16          A.    Yes.

17          Q.    Okay.  Besides Hillard

18     Williams were there any other black

19     males that you know got a starting

20     salary of 30,000 for being a store

21     manager?

22          A.    Henry Easley.

23          Q.    How do you spell his last
```

```
 1    name?  I'm sorry.

 2         A.    E-A-S-L-E-Y.

 3         Q.    Okay.  And what store did

 4    he take?

 5         A.    The Selma store.

 6         Q.    And how did you know that

 7    he got 30,000?

 8         A.    Per the e-mail.

 9         Q.    Any other black male

10    managers that you know got $30,000.00

11    as a store manager, as a starting

12    salary as a store manager?

13         A.    No.

14         Q.    Okay.  What regions were

15    these folks in?

16         A.    District five.

17         Q.    Who was the RM at the time?

18         A.    Dave Deal.

19         Q.    And he was also your

20    regional manager, correct?

21         A.    That's correct.

22         Q.    And who was the district

23    manager for this district?
```

1        A.    Jim Berry.

2        Q.    He was also your district

3    manager, correct?

4        A.    Yes.

5        Q.    Tell you what, why don't we

6    take another little bit of a break?

7    Maybe five, 10 minutes.

8

9              (Whereupon, a brief

10              recess was taken

11              in the deposition.)

12

13        Q.    (BY MR. MULROY):   All

14    right.   Let's get back.   You were

15    promoted then in September of 2003,

16    and what store did you initially

17    have?

18        A.    Fairview.

19        Q.    Okay.   And how long did you

20    stay at that store?

21        A.    I stayed there

22    approximately six months.

23        Q.    Okay.   And where did you go

1    after the Fairview store?

2         A.    Prattville.

3         Q.    Prattville?

4         A.    Prattville.

5         Q.    What kind of store was it

6    at Prattville, what brand?

7         A.    U.S..

8         Q.    And why did you go from

9    your initial store where you were a

10   manager to the Prattville store?

11        A.    Because it was closer to

12   home.

13        Q.    That was at your election

14   then?  In other words, you're the one

15   who made the decision whether or not

16   you're going to be transferred?

17        A.    No.

18        Q.    Okay.  Who made that

19   decision?

20        A.    Mr. Deal.

21        Q.    Were you unhappy with that

22   decision?

23        A.    No.

1        Q.    You liked being closer to
2    home?
3        A.    Right.
4        Q.    At Prattville, who worked
5    there?
6        A.    I'm sorry?
7        Q.    Who worked at the
8    Prattville store with you?
9        A.    No one.
10        Q.    Okay.  At Fairview did
11    anybody work with you?
12        A.    No.
13        Q.    The Prattville store, was
14    it a new store or an established
15    store?
16        A.    It was a new store.
17        Q.    Did you open it?
18        A.    No.
19        Q.    How long had it been
20    opened?
21        A.    One month.
22        Q.    How much?
23        A.    One month.

165

1    Q.    Okay.  Was that the last

2    conversation that you had with

3    anybody in management about your

4    feelings that you should have gotten

5    a raise to 30,000?

6    A.    Yes.

7    Q.    Okay.  During the

8    conversations with Mr. Deal or

9    Mr. Berry did you raise the question

10    of your belief that it was based on

11    race?

12    A.    Not with either of them

13    two.  No.

14    Q.    Okay.  Who did you raise it

15    with?

16    A.    Nobody.

17    Q.    Nobody?

18    A.    No.

19    Q.    And at that time you were

20    aware that there some other black

21    managers who did make $30,000.00 a

22    year, correct?

23    A.    Yes.

1    of occasions that I was telling

2    customers that they didn't have to

3    pay on their accounts.  And I mean, I

4    wanted to know why.  Because as far

5    as a slow file problem when I was

6    there it wasn't an issue, so why

7    would I tell someone that they're not

8    going to or they don't have to pay on

9    their account.

10        Q.    What did Mr. Deal say to

11   you?

12        A.    I don't remember his

13   conversation with me, what he said,

14   other than to talk to my DM.  And

15   that was basically it.

16        Q.    Your DM was Mr. Berry?

17        A.    Yeah.  Jim Berry.

18        Q.    What did Mr. Berry say the

19   problem was?

20        A.    Mr. Berry responded to me

21   that that's what was going on, and I

22   didn't have any idea as to who he was

23   talking about.  I mean, you don't

171

1    tell somebody that they don't have to

2    pay on their account.  I mean, it

3    doesn't make sense.

4        Q.    Did Mr. Berry tell you that

5    he felt you were not applying company

6    policy equally across the board?

7    That some customers were treated

8    better or worse than other customers?

9        A.    No.

10       Q.    Did Mr. Berry tell you that

11   he suspected that you were

12   misapplying policies to make your own

13   numbers get higher?

14       A.    No.

15       Q.    Okay.  Do you remember what

16   Mr. Berry did tell you the problem

17   was?

18       A.    That I was telling

19   customers that they didn't have to

20   pay on their account.

21       Q.    Okay.  And what did that

22   mean to you?

23       A.    Well, I thought it was a

173

```
 1        A.    I remember one.  Ms. Marisa

 2    Hester.

 3        Q.    What was her complaint?

 4        A.    She said that I said over

 5    the phone that I was going to repo

 6    her car, that I wouldn't repo her

 7    car.

 8        Q.    Okay.  And you did not say

 9    that?

10        A.    No, sir.

11        Q.    That's against company

12    policy, correct?

13        A.    We usually work them to the

14    office before we have any discussion

15    about anything.  There's several

16    options that you go through before

17    you would even discuss something like

18    that.

19        Q.    You don't make threats like

20    that, correct?

21        A.    No, sir.

22        Q.    And that's against company

23    policy to make those kind of threats
```

1    isn't it?

2         A.    Yes.    It is.

3         Q.    Okay.    Do you remember

4    having had oral discussions with

5    Mr. Berry about inappropriate use of

6    rude language and profanity to

7    customers?

8         A.    Yes.

9         Q.    Okay.    On how many

10   occasions did that occur?

11        A.    Once.

12        Q.    When did it occur?

13        A.    I don't remember when.    I

14   don't remember what date.

15        Q.    Were you at Prattville or

16   Fairview?

17        A.    Prattville.

18        Q.    And where did this occur?

19   Was it at the store?    The

20   conversation?

21        A.    Yes.    Yes.

22        Q.    What did Mr. Berry say to

23   you and what did you say to him?

```
 1        A.    I'm sorry.  It wasn't Mr.
 2   Berry that I had the conversation
 3   with.
 4        Q.    Who was it with?
 5        A.    It was Mr. Michael Knight.
 6        Q.    Okay.  Mr. Knight.  What
 7   did Mr. Knight say to you and what
 8   did you say to him?
 9        A.    Well, he told me that I had
10   cursed a customer, a customer that we
11   had actually repo'd.  She was a
12   considerable amount of days past due.
13   And we had repo'd her.  And she came
14   to the office to redeem it, and upon
15   redeeming she said that I cursed her
16   in the office.  And that was
17   basically it.
18        Q.    Okay.  So Mr. Knight by
19   then was your DM?
20        A.    Yes.  Mr. Knight was my DM.
21        Q.    At what point did Mr.
22   Knight become your DM?
23        A.    I don't remember the date.
```

```
 1    I don't remember the time.
 2         Q.   Was that because of a
 3    reorganization, or why did Mr. Berry
 4    discontinue being the DM; do you
 5    remember?
 6         A.   No, sir.  I don't remember.
 7         Q.   Any other discussions with
 8    any managers above you concerning
 9    your performance or your conduct at
10    either the Prattville or Fairview
11    store that you can recall?
12         A.   No, sir.
13         Q.   Okay.  You don't recall
14    having a similar conversation with
15    Mr. Berry about cursing at customers?
16         A.   Not with Mr. Berry.  No.
17         Q.   Okay.  At what point did
18    you learn of your demotion?
19         A.   Mr. Michael Knight came in
20    and demoted me September the 7th,
21    2004.  He told me how he was going to
22    do it.  He didn't tell me when he was
23    going to do it.
```

1          Q.    What did he say?

2          A.    The day of the demotion?

3          Q.    Yeah.

4          A.    He told me that we decided

5     that we needed to make a -- that you

6     needed more training and that we want

7     you to go down to the TitleMax store

8     this time.

9          Q.    The TitleMax store in

10     Prattville?

11          A.    Yes.

12          Q.    How close is the TitleMax

13     store in Prattville to your store?

14          A.    Less than a mile.

15          Q.    I think you testified to

16     this earlier.  Let me confirm this.

17     During the time you were store

18     manager you never received a bonus?

19          A.    No, sir.

20          Q.    I hate it when I ask

21     questions like that because it makes

22     the answer unclear.  Is it correct

23     that you did not receive a bonus as a

178

```
1    manager as a store manager?

2         A.    Now during the month that I

3    was demoted I would have profited.  I

4    was going to profit.  I was going to

5    profit.

6         Q.    Okay.  That's not my

7    question though.  The question is:

8    During the time that you were a store

9    manager did you ever receive a bonus

10   for being a store manage?

11        A.    Well, I was a store manager

12   in September, the month of the

13   profit, but I didn't receive it.

14        Q.    Did you get a bonus?

15        A.    No.

16        Q.    Okay.  Didn't get a bonus.

17   And you didn't get a bonus the entire

18   other 12 months that you had been a

19   manager, correct?

20        A.    That's correct.

21        Q.    And that was because you

22   didn't earn a bonus, correct?

23        A.    That's correct.
```

1      Q.    Okay.  Now at the time that

2   you were demoted how much were you

3   earning?

4      A.    26.

5      Q.    Okay.  And the minute after

6   you were demoted what were you

7   earning?

8      A.    26.

9      Q.    You were not going down in

10   pay any?

11      A.    No.  Just the benefits.

12      Q.    Okay.  And what benefits

13   did you lose?

14      A.    $200.00 a month insurance

15   reimbursement, and the $40.00 phone

16   reimbursement.

17      Q.    Okay.  What did you say to

18   Mr. Knight after he told you that you

19   were being demoted for training

20   purposes?

21      A.    I asked him who did I need

22   to talk to and, you know, what was

23   the problem.  He told me that -- I

180

1    asked him could he give me Tracy

2    Young's phone number.  And he said

3    your best course would be to talk to

4    Dave Deal, so after I left the office

5    to go get a TitleMax shirt I called

6    Dave Deal from my home and talked

7    with Mr. Dave Deal.  And he told me

8    he just needed to make a change in

9    that office.

10        Q.    Did he say why?

11        A.    No.

12        Q.    About how long did this

13   conversation take place with Mr.

14   Deal, the length of the conversation?

15        A.    Not long.  Maybe a minute.

16        Q.    Was anything else

17   discussed?

18        A.    That was it.

19        Q.    Was there any discussion of

20   what would happen after you were

21   retrained with either Knight or Deal?

22        A.    No.

23        Q.    Was it your understanding

```
 1    there was a possibility you'd be

 2    re-promoted to manager?

 3         A.    No.

 4         Q.    Was there an understanding

 5    that you would never be re-promoted

 6    to manager?

 7         A.    I have no idea.  I don't

 8    know.

 9         Q.    It is a fact that you know

10    of managers that have been demoted,

11    retrained and sent back to other

12    stores as managers, correct?

13              MS. WOODHAM:   Objection.

14         A.    There's only one manager

15    that I know that was demoted.

16         Q.    Who was that?

17         A.    White male.  I can't think

18    of his name.

19         Q.    Okay.  You testified to it

20    earlier today, right?

21         A.    Yes.

22         Q.    Okay.  After your demotion

23    what did you do?
```

182

```
 1        A.    I was put in the TitleMax

 2   store.

 3        Q.    In Prattville?

 4        A.    Yes.

 5        Q.    And who was your boss

 6   there, your manager?

 7        A.    David Cox.

 8        Q.    Had you ever worked for Cox

 9   before that?

10        A.    No.

11        Q.    So after the demotion you

12   were put in Cox's store?

13        A.    That's correct.

14        Q.    Okay.  Had you ever had any

15   run-ins with Cox before you were

16   transferred over to his store?

17        A.    Well, there was discussions

18   about me getting assistance from his

19   office, and every time I would ask

20   him he would always have his people

21   doing something.

22        Q.    He was avoiding giving you

23   help?
```

183

```
 1          A.    Assistance.   Yes.

 2          Q.    Earlier you testified that

 3   there were two people who were sent

 4   over on a weekly basis?

 5          A.    Yes.

 6          Q.    And was that from Cox's

 7   store mostly?

 8          A.    That's correct.

 9          Q.    Okay.  But you wanted more

10   assistance; is that the point?

11          A.    There were times when he

12   wouldn't send anybody at all.

13          Q.    Because they were doing

14   something, ostensible?

15          A.    Well, you got five people

16   in your store.  How busy can it be?

17          Q.    And on what occasions would

18   he not send somebody over?

19          A.    At his discretion or just

20   whenever he just felt like he didn't

21   want to send anybody over.

22          Q.    Did Cox ever say anything

23   to you of a derogatory nature,
```

184

1    racially derogatory nature?

2         A.    Not to me.

3         Q.    Did he say something of a

4    racially derogatory nature that came

5    to your attention?

6         A.    Yes.

7         Q.    Okay.  What was it that Cox

8    said?

9         A.    Cox used the N word and

10   said that he hoped that black SOB

11   fails.  And also that he was not

12   going to help him.

13        Q.    Who did he use the N word

14   to?

15        A.    In the presence of Jack

16   Bozeman.

17        Q.    Okay.  And who was he

18   talking to?

19        A.    He was on the phone talking

20   to Jim Berry.

21        Q.    And when did this

22   conversation -- and I understand you

23   don't know, you never heard any of

185

1    this, correct?

2         A.    No, sir.  Not directly.

3         Q.    And you weren't present?

4         A.    No.

5         Q.    From your own personal

6    knowledge you don't know what

7    Mr. Berry said, you don't know what

8    Cox said.  You're getting this

9    secondhand from Jack Bozeman,

10   correct?

11        A.    That's correct.

12        Q.    Okay.  And so I'm just

13   asking your understanding of the

14   conversation?

15        A.    Uh-huh.

16        Q.    What is your understanding

17   of when this occurred, when this

18   conversation occurred?

19        A.    While I was manager at the

20   Prattville location.

21        Q.    Okay.  And how long before

22   you were actually transferred,

23   demoted did this occur?

1      A.    I don't understand the

2  question.

3      Q.    Okay.  Let's break it down.

4  This conversation occurred at some

5  point, correct?

6      A.    Yes.

7      Q.    Okay.  And ideally I'd like

8  to have a date.  Do you know the date

9  when the conversation allegedly

10  occurred?

11      A.    No.

12      Q.    Okay.  In relationship to

13  your demotion, when did it occur?

14  Did it occur three months before your

15  demotion, for example?

16      A.    I don't know.

17      Q.    Six months before your

18  demotion?

19      A.    I don't know.

20      Q.    You don't really know when

21  it allegedly occurred?

22      A.    (Witness shaking head.)

23      Q.    Okay.  That's a no?

1          A.    No.   I don't know when it
2    occurred.
3          Q.    When did you first hear
4    about this conversation?
5          A.    After I was assistant
6    manager with Cox.
7          Q.    How far after you were an
8    assistant manager with Cox?
9          A.    Maybe three months.
10          Q.    How did you learn of this
11    allegation?
12          A.    Jack Bozeman called me up
13    from the U.S. store and told me he
14    had something to tell he.  We met in
15    front of the Winn-Dixie there right
16    across from the TitleMax.  And that's
17    when he told me.
18          Q.    What did he say to you?
19          A.    He told me at the time that
20    David Cox was not my friend, and I
21    had to be very careful around him
22    because he was trying to get me
23    fired.  And he proceeded to tell me

188

```
 1    some more and...

 2         Q.    What else did he tell you?

 3         A.    Well, he told me about the

 4    N word and things like that.

 5         Q.    What did he say about the N

 6    word?

 7         A.    He said David Cox referred

 8    to me as a nigger on the phone.

 9         Q.    In that same conversation

10    with Berry?

11         A.    Right.

12         Q.    Did he tell you anything

13    else?

14         A.    No.

15         Q.    Okay.  Is that the only

16    conversation you had with Bozeman

17    about Cox?

18         A.    No.

19         Q.    Okay.  Tell me when was the

20    next time you talked to Bozeman about

21    Cox?

22         A.    Well, the next times we

23    talked is when we met to go to Kay
```

1        Q.    Have you talked to Bozeman

2    since the meeting at your attorney's

3    office?

4        A.    I mean, yes.  He's my

5    manager.  We talk on a daily basis.

6        Q.    So the relationship with

7    you and Bozeman's good?

8        A.    Yes.  I don't have a

9    problem with Mr. Bozeman.

10        Q.    He's a white male?

11        A.    Yes.

12        Q.    Temperate, tolerant guy?

13        A.    I'm not sure I understand

14    what you mean.

15        Q.    Is he a racially tolerant

16    person?

17        A.    I'm not sure I understand

18    what you mean.

19        Q.    Okay.  Do you feel

20    comfortable with Mr. Bozeman?

21        A.    Yes.

22        Q.    He has been your manager

23    for how long?

```
 1        A.    About a year.

 2        Q.    And that's been a

 3   comfortable relationship for you?

 4        A.    Yes.

 5        Q.    All right.  Going back to

 6   the conversation at Winn-Dixie, what

 7   did you do after Bozeman tells you

 8   this?

 9        A.    Nothing.

10        Q.    Did you call up Dave Deal

11   and tell him?

12        A.    No.

13        Q.    Did you contact human

14   resources at the company?

15        A.    Employee hotline.

16        Q.    Did you?

17        A.    I tried to call them on

18   several occasions.

19        Q.    Okay.  And when did you try

20   to call them?

21        A.    I don't remember when.  It

22   was after the fact.

23        Q.    Okay.  Was it near the time
```

196

```
1    that you were considering in filing

2    the charge?  Did you consider before

3    filing the charge?

4        A.   I'm not sure I understand

5    what you mean.

6        Q.   Yeah.  You've given a

7    reason for why you filed the charge,

8    some of the facts.  And I'm just

9    asking you were there any other facts

10   you considered before you filed the

11   charge?

12       A.   No.

13       Q.   Okay.  And then Bozeman

14   comes up to you at Winn-Dixie and he

15   filed an affidavit which went to the

16   EEOC and the EEOC considered,

17   correct?

18       A.   Uh-huh.  Yes.

19       Q.   Okay.  And Mr. Cox was on

20   the same level as you were in the

21   company, correct?

22       A.   That's correct.

23       Q.   And as a manager you did
```

1    not have any hiring, promotion or

2    demotion responsibilities, correct?

3         A.    That's correct.

4         Q.    And neither did Mr. Cox,

5    correct?

6         A.    That's correct.

7         Q.    Okay.  And he wasn't

8    involved in the decision to demote

9    you to your knowledge, correct?

10        A.    Well, he made statements to

11   Jack Bozeman that we would use the

12   complaints to get Steve Nemo demoted.

13        Q.    Okay.  When did he say that

14   to Jack Bozeman?

15        A.    I don't remember when.  I

16   don't know when.

17        Q.    Okay.  And how did you

18   learn of those complaints to Jack

19   Bozeman?

20        A.    During the time when he

21   talked with Ms. Kay Dickie.

22        Q.    Okay.  He didn't say that

23   to you at the Winn-Dixie did he?

203

```
 1        A.    There were periods of time
 2   that he would you use the N word.
 3   There again, you know, you try to
 4   call home -- you try to call the
 5   employee hotline but never could get
 6   in touch with anybody.  You know,
 7   you'd leave messages.
 8        Q.    You're saying that Cox used
 9   the N word in front of you?
10        A.    Yes.
11        Q.    I thought I asked about
12   that earlier?
13        A.    No.
14        Q.    And you said no, that it
15   didn't happen in front of you?
16        A.    It didn't happen in front
17   of me when I was a manager but you
18   was asking me about --
19        Q.    When did Cox use the N word
20   in front of you?
21        A.    There were a few occasions
22   where -- where he did.
23        Q.    Where did it occur?
```

```
 1          A.    In the office.

 2          Q.    Who was present?

 3          A.    Jack Bozeman was present.

 4          Q.    Anybody else?

 5          A.    No.

 6          Q.    Okay.  And you say that you

 7   tried to call the employee hotline?

 8          A.    Yes.

 9          Q.    Okay.  And you couldn't get

10   through to it.

11          A.    I mean, leave a message on

12   the answering machine.

13          Q.    Okay.  Anything else that

14   Mr. Cox did to make you feel

15   uncomfortable?

16          A.    No.

17          Q.    Okay.  Now how did it come

18   to be that you were transferred?

19          A.    I asked Michael Knight to

20   be transferred.

21          Q.    When did you ask him that?

22          A.    I don't remember when.

23          Q.    Okay.  How long before you
```

1    were actually transferred did you ask

2    him?

3         A.    He had to get permission.

4    There were several times I asked, and

5    he had to get permission from Dave

6    Deal.

7         Q.    Okay.  When was the first

8    time you asked?

9         A.    I don't remember.

10        Q.    Okay.  When were you

11   actually transferred?

12        A.    I don't remember the date.

13        Q.    Okay.  And how long before

14   the last time you asked were you

15   transferred?

16        A.    I don't remember.

17        Q.    Was there a discussion

18   about your transfer?  How did you

19   learn you were being transferred?

20        A.    Michael Knight called me up

21   one day and asked me was I still

22   interested in going to the U.S.

23   store.  I told him, yes.

```
 1        Q.   And then how long after you
 2   had that conversation with Knight
 3   were you transferred?
 4        A.   Maybe a week.
 5        Q.   Okay.  Whose position did
 6   you take?
 7        A.   We had an opening over
 8   there.  There was no position.
 9        Q.   Okay.  There was a new
10   opening?
11        A.   Right.  Kevin Godwin had
12   moved to Auburn.  Jack Bozeman took
13   his position, and I moved into the
14   assistant manager position.
15        Q.   Okay.  And my understanding
16   is now, that you've been happy with
17   Bozeman since you transferred?
18        A.   Right.  No problems.
19        Q.   No problems with him at
20   all?
21        A.   No.
22        Q.   Do you know what an
23   assistant manager questionnaire is?
```

1  A. Yes.

2  Q. What is an assistant

3 manager questionnaire?

4  A. That's the questionnaires

5 where they qualify assistant managers

6 for the profit sharing.

7  Q. Okay.  And do you recall an

8 occasion in December of this year --

9 of last year when Mr. Knight came to

10 you with an assistant manager

11 questionnaire?

12  A. Yes.

13  Q. Okay.  Tell me about the

14 conversation when he came to you with

15 an assistant manager questionnaire?

16  A. I don't remember the

17 conversation.  He was telling me

18 about the questionnaire, but I don't

19 remember our conversation.

20  Q. Okay.  Did you fill the

21 questionnaire out?

22  A. No.

23  Q. And why didn't you fill the

1    questionnaire out?

2        A.    Well, at the time attorneys

3    told me that -- not to do it.

4        Q.    Okay.  And it wasn't your

5    current attorney who told you that?

6        A.    No.

7        Q.    Okay.  So you did not turn

8    in the assistant manager

9    questionnaire, correct?

10        A.    No.

11        Q.    And you understood the

12    assistant manager questionnaire is

13    what they base getting a bonus on in

14    part?

15        A.    That's correct...

16        Q.    And you understood that if

17    you didn't fill out the assistant

18    manager questionnaire, you couldn't

19    be considered for any other

20    management jobs, correct?

21        A.    That's correct.

22        Q.    Okay.  Have you since

23    changed your mind about filling out

212

```
 1          Q.    Who is that?

 2          A.    Gilbert Red.  He was

 3   promoted to manager in Wetumpka.

 4          Q.    Okay.  And when was that?

 5          A.    I don't remember when.

 6          Q.    And when were the

 7   questionnaires first required?

 8          A.    I don't remember when.

 9          Q.    And you're saying that only

10   black managers are required to fill

11   out questionnaires?

12          A.    No, sir.  No, sir.

13          Q.    It is a fact that both

14   white and black assistant managers

15   have been required to fill out

16   questionnaires in order to get their

17   bonuses, correct?

18          A.    That's correct.

19          Q.    And you didn't -- did you

20   get your bonus?

21          A.    Yes.

22          Q.    Despite the fact you didn't

23   fill out your questionnaire?
```

1       A.    Yes.

2       Q.    And the basis for you not

3   filling out this questionnaire isn't

4   because racially you felt it was

5   discriminatory, you just thought

6   management didn't have power to make

7   you do that; is that right?

8            MS. WOODHAM:   Objection.

9       A.    Well, it is discriminatory

10  if you make the assistance do it and

11  not the managers or the DM's or the

12  regionals.

13       Q.    (BY MR. MULROY):   On what

14  basis is it discriminatory?

15       A.    You're not making the

16  managers or the assistants -- I mean

17  the regionals.

18       Q.    It's not based on age, sex,

19  race, correct?

20       A.    No.

21       Q.    Okay.   It's discriminatory

22  on what basis then?

23       A.    Classification.

1    of the different managers and their

2    salaries or different employees and

3    their salaries.

4         Q.    Where did you get this?

5         A.    It was left on Jim Berry's

6    e-mail.

7         Q.    I believe earlier you said

8    there was an e-mail that went along

9    with this?

10        A.    No.   It wasn't -- I mean, I

11   don't if you could say it went along

12   with that.   It just showed the

13   different -- time that I was going to

14   be demoted.

15        Q.    Let me ask you:   This is

16   not an e-mail, correct?

17        A.    No.

18        Q.    Okay.   Exhibit 1 is not an

19   e-mail.   Exhibit 1 is an Excel

20   spreadsheet, correct?

21        A.    Uh-huh.

22        Q.    And you can't pull Excell

23   spreadsheets in Outlook e-mail can

1    you?

2         A.    This was in his e-mail.

3         Q.    Yes, sir.

4         A.    Yes.

5         Q.    It will not appear on the

6    e-mail box, right?  It would have to

7    appear as an attachment?

8         A.    Right.

9         Q.    So you had to see there was

10   an e-mail up on the screen, and you

11   had to click on your manager's

12   attachment, correct?

13        A.    Yes.

14        Q.    And that way you got into

15   his document, correct?

16        A.    Yes.

17        Q.    Why did you think you could

18   do that?  Why did you think it was

19   permissible for you to go in to your

20   manager's documents?

21        A.    He left it up.

22        Q.    He left the e-mail up,

23   right?

218

1          A.     That's correct.

2          Q.     And what did the e-mail

3     say?

4          A.     I don't remember what the

5     e-mail said.  It was just a -- I

6     don't remember what the e-mail said.

7          Q.     So you think just because

8     people leave things out it's okay for

9     you to open them up and go into them;

10    is that correct?

11         A.     Well, I work for a company

12    that has nothing to hide.  I mean, I

13    had no idea that he had something to

14    hide.

15         Q.     Okay.  And you don't

16    believe that management can keep

17    things confidential from employees?

18         A.     If it was kept

19    confidential, it wouldn't have been

20    left up.

21         Q.     All right.  Just a second

22    now.  You had to open up the

23    attachment, correct?  It was an Excel

1    attachment.

2         A.    I mean, I don't understand

3    what you mean.

4         Q.    On the Outlook screen

5    there's an e-mail message, correct?

6         A.    Yes.

7         Q.    There's an e-mail message?

8         A.    Yes.

9         Q.    And on that there's an

10   attachment, correct?

11        A.    Yes.

12        Q.    And to get into the

13   attachment you actually have to take

14   the mouse and click on the attachment

15   and wait for it to come up, correct?

16        A.    Yes.

17        Q.    So how is that any

18   different from going into Mr. Berry's

19   private files?

20             MS. WOODHAM:  Objection.

21        A.    I'm not sure I understand

22   the question.  Because he left it up

23   on the computer.

220

```
 1          Q.    (BY MR. MULROY):   He left
 2     the e-mail up, right?
 3          A.    Yes.
 4          Q.    He did hot leave the Excel
 5     spreadsheet up did he?
 6          A.    He left this up where I
 7     could see it.
 8          Q.    He left the e-mail up,
 9     correct?
10               MS. WOODHAM:   Objection.
11          Q.    (BY MR. MULROY):   You had
12     to physically open the Excell
13     spreadsheet, correct?
14          A.    He left this up where I
15     could see it.
16          Q.    Yes, sir.  Yes, sir.
17          A.    Where all I had to do was
18     click on it.
19          Q.    I'm asking for straight
20     answers.
21          A.    I'm not sure I understand
22     what you mean.
23          Q.    You had to open the Excell
```

1   spreadsheet?  It was not up on the

2   screen, correct?

3        A.    I mean, I didn't just click

4   on it and it open up.

5        Q.    You're right.  You had to

6   click on it for it to open up,

7   correct?

8              MS. WOODHAM:  Objection.

9        A.    Yes.  I had to click on it.

10       Q.    (BY MR. MULROY):  Now let's

11   talk about the spreadsheet.

12       A.    Sure.

13       Q.    Who's Jack Medley?

14       A.    Former manager with

15   TitleMax.

16       Q.    Okay.  And his race?

17       A.    White male.

18       Q.    And he started as a

19   manager, correct?

20       A.    Uh-huh.

21       Q.    And he was paid as a

22   manager, is the starting salary the

23   same as yours?

222

```
 1          A.    Yes.

 2          Q.    And then there's Gary Fail.

 3    He's an assistant manager, correct?

 4          A.    Yes.

 5          Q.    What race is he?

 6          A.    White male.

 7          Q.    Okay.  And he started at

 8    slightly -- well, he started at more

 9    than you did as an assistant manager,

10    correct?

11          A.    Yes.

12          Q.    And who is Dan Taylor?

13          A.    White male.

14          Q.    Okay.  And who is Teresa

15    McCall?

16          A.    White female.

17          Q.    She was a collector.  What

18    is a collector?

19          A.    Basically just someone who

20    just collects.

21          Q.    Okay.  And then Wanda

22    Asberry?

23          A.    Uh-huh.
```

223

```
 1          Q.    Black female?

 2          A.    Yes.

 3          Q.    She started at more than

 4   you did, correct?

 5          A.    Yes.

 6          Q.    Jermaine McCall?   Black

 7   male?

 8          A.    Black male.

 9          Q.    Started at more than you

10   did, right?

11          A.    Yes.

12          Q.    Kirk Bennet?

13          A.    I don't know.

14          Q.    Would you not agree that

15   Kirk Bennet is a white male?

16                MS. WOODHAM:   Objection.

17          A.    I don't know.

18          Q.    (BY MR. MULROY):   Started

19   at the same amount as you, correct?

20          A.    He started at the same

21   amount.

22          Q.    Eddie Hoskin?

23          A.    Black male.
```

224

```
 1          Q.   Started at the same amount
 2    as you, correct?
 3          A.   Yes.
 4          Q.   He was raised to 28,000,
 5    correct, when he became a manager?
 6          A.   Correct.
 7          Q.   Kim Boswell?
 8          A.   White male.
 9          Q.   He started at the same as
10    you -- no, I'm sorry.  He started at
11    28,000, correct?
12               MS. WOODHAM:  Objection.
13          Q.   (BY MR. MULROY):  I'm
14    sorry.  I'm totally wrong here.  He
15    started the same as you, correct?
16          A.   Yes.
17          Q.   Okay.  Shane Cahalan?
18          A.   White male.
19          Q.   Started at 30,000, right?
20          A.   Yes.
21          Q.   Scott Seay?
22          A.   I don't know.
23          Q.   Okay.  Started at the same
```

```
 1    as you, correct?

 2         A.    Yes.

 3         Q.    You don't know whether or

 4    not he's a white male?

 5         A.    No.

 6         Q.    Jason Jackson?

 7         A.    Black male.

 8         Q.    Started higher than you,

 9    correct?

10         A.    Yes.

11         Q.    At $23,920.00, correct?

12         A.    Yes.

13         Q.    Hillard Williams?

14         A.    Black male.

15         Q.    Started at 30,000, correct?

16         A.    Yes.

17         Q.    Steve Nemo.  That's you?

18         A.    Yes.

19         Q.    David Cox?  White male,

20    right.

21         A.    Yes.

22         Q.    Started at 28,000?

23         A.    Yes.
```

226

1      Q.    Jack Bozeman?

2      A.    Yes.

3      Q.    White male, correct?

4      A.    White male.

5      Q.    Started the same as you,

6  correct?

7      A.    Yes.

8      Q.    Got the same as you when he

9  was promoted the first time, and you

10  were promoted the first time at

11  $22,880.00, correct?

12          MS. WOODHAM:  Objection.

13      Q.   (BY MR. MULROY):  Is that

14  correct?

15      A.   (Witness reviews document.)

16  Not according to the...

17      Q.    Jack Bozeman?

18      A.    Yeah.

19      Q.    Okay.  I got his starting

20  salary at $20,800.00 and then his

21  annual current salary at $22,880.00

22  which I believe was your first raise,

23  correct?

227

1          A.    Yes.

2          Q.    Now isn't it a fact that

3    you and Jack Bozeman had a discussion

4    about pay, about his pay?

5          A.    During this time?

6          Q.    Yeah.  During the time that

7    you were upset about pay, you filed

8    your charge, you and Jack Bozeman had

9    already talked about his pay as well,

10   correct?

11         A.    After Jack Bozeman became a

12   manager.

13         Q.    Okay.

14         A.    Yes.

15         Q.    You talked to him about pay

16   and that he was dissatisfied about

17   the way he was being treated in

18   regard to pay, correct?

19         A.    I don't remember if he said

20   he was dissatisfied or if he was

21   fixing to get another raise.  I don't

22   remember the conversation.

23         Q.    Didn't Bozeman tell you

228

```
 1    that he was also paid like you were

 2    paid and he did not like it because

 3    he felt that he should've been paid

 4    more?

 5         A.    When Bozeman first was

 6    promoted?

 7         Q.    Right.

 8         A.    Yes.

 9         Q.    He told you that, right?

10         A.    Yes.

11         Q.    And that was before you

12    filed your EEOC charge?

13         A.    Before I filed my -- that

14    conversation with Bozeman?

15         Q.    Right.

16         A.    Yes.

17         Q.    So you knew that Bozeman, a

18    white male, was being treated the

19    same as you, a black male, and that

20    it was based on almost the exactly

21    the same figures, if not exactly the

22    same figures.  And you still filed an

23    EEOC charge after having seen Exhibit
```

1    Number 1?

2            MS. WOODHAM:  Objection.

3        A.    Bozeman got a raise, too,

4    two months later.

5        Q.    He got a raise to what you

6    make, correct, as manager?  To what

7    you made as a manager?  He got a

8    raise 26,000-something?

9            MS. WOODHAM:  Objection.

10       A.    After he became a manager

11   he got a raise two months after he

12   became a manager.

13       Q.    (BY MR. MULROY):  Right.

14   To what figure?

15       A.    More than 26.

16       Q.    What was it?

17       A.    I don't remember.

18       Q.    Okay.  Now we've been

19   through most of these already.  We're

20   going to go through the rest of them.

21   Can we agree that both black and

22   white managers were paid differently,

23   and that some black managers got paid

230

```
1    30,000 and 28, and that some white

2    managers got paid exactly the way you

3    got paid?

4         A.   Yes.

5         Q.   That there's no pattern

6    here?

7              MS. WOODHAM:  Objection.

8         Q.   (BY MR. MULROY):  Do you

9    agree with that?

10        A.   I'm not sure I understand

11   the question.

12        Q.   That both blacks and whites

13   are being paid different amounts.

14   Some whites are paid more than some

15   blacks.  Some blacks are paid more

16   than some whites.  And some whites

17   and blacks are paid exactly the same

18   for the same jobs?

19             MS. WOODHAM:  Objection.

20        A.   According to this

21   (indicating) all white managers are

22   making 30,000.

23        Q.   (BY MR. MULROY):  Okay.  Is
```

251

1        Q.    Okay.  That spreadsheet,

2    that Excell spreadsheet, was not

3    attached to that e-mail?

4        A.    No.

5        Q.    Okay.  Currently can you

6    tell me who the managers are in your

7    district?

8        A.    No, sir.

9        Q.    And why can't you do that?

10        A.    I mean, all managers?

11        Q.    Yeah.

12        A.    I don't know all the

13    managers in my district.

14        Q.    Would you agree that it's a

15    mixture of white males and black

16    males and white females and black

17    females?

18            MS. WOODHAM:  Objection.

19        A.    I don't know.

20        Q.    (BY MR. MULROY):  Okay.

21    Tell me about what the hotline is?

22        A.    The employee hotline.

23    There's a line set up for employees

```
1     that if they have grievance or

2     problems in their office with

3     management that they can call and

4     express what's going in their

5     particular -- or whatever they have a

6     problem with.

7          Q.   And if an employee hot line

8     call doesn't work, you also have

9     access to Tracy Young?

10         A.   I'm not sure I understand.

11         Q.   Yeah.  Have you ever read

12    the tips of the day?

13         A.   Yes.

14         Q.   And were you ever given an

15    e-mail address to address complaints

16    about the company including racial

17    discrimination complaints that went

18    right to the top?

19         A.   Yes.

20         Q.   Did you ever send Mr. Young

21    or anybody at corporate headquarters

22    an e-mail complaint about racial

23    discrimination?
```

253

```
 1        A.    No.

 2        Q.    Okay.  And have you ever

 3   known any employees to use the

 4   hotline other than yourself?

 5        A.    No.

 6        Q.    Okay.  When the hotline,

 7   when you didn't get a return call on

 8   the hotline, you didn't make any

 9   effort to use e-mail to see what was

10   wrong?

11        A.    No.

12        Q.    Do you know who Natalie

13   Peterson is?

14        A.    Yes.

15        Q.    Who is Natalie Peterson?

16        A.    She's head of human

17   resources.

18        Q.    Have you ever been to any

19   lectures or any instructional events

20   where Natalie Peterson spoke?

21        A.    No.

22        Q.    How do you know Natalie

23   Peterson is head of human resources?
```

1        A.    From the e-mail.

2        Q.    Okay.  And she sends

3   e-mails out instructing on corporate

4   policy, correct?  Human relations

5   policy?

6        A.    Yes.

7        Q.    Okay.  How many e-mails of

8   that sort have you gotten from her?

9        A.    I don't know.

10       Q.    More than one?

11       A.    Yes.

12       Q.    And you read them and obey

13   them, correct?

14       A.    Uh-huh.

15       Q.    And did you keep tips of

16   the day at your location?

17       A.    Yes.

18       Q.    And all the managers that

19   you ever worked for kept tips of the

20   day at their location, right?

21       A.    Yes.

22       Q.    And you read those tips of

23   the day, correct?

1    managers that they would never be

2    demoted for having slow files.  First

3    off, what does it mean to have a slow

4    file?

5        A.    Those are delinquent

6    accounts.

7        Q.    Delinquent, okay.  And how

8    does this relate to your lawsuit?

9    Were you told that you were being

10   demoted because you had slow files?

11   This is paragraph 15 of the factual

12   allegations of your complaint?

13       A.    No, sir.  I wasn't told

14   that.

15       Q.    Okay.  Now in paragraph 18

16   of the factual allegations you said,

17   Plaintiff did not receive any formal

18   training for his position as

19   assistant manager or manager.  It is

20   a fact that earlier today you

21   testified there was about a month

22   period where you received training,

23   correct?

261

1    rent-to-own business, correct?

2         A.    Now when you say different.

3         Q.    Okay.  Let's break it down

4    into component parts.

5         A.    Yes.

6         Q.    You didn't have to appraise

7    cars in the rent-to-own business did

8    you?

9         A.    No, sir.

10        Q.    You didn't have to

11   repossess cars in the rent-to-own

12   business did you?

13        A.    No, sir.

14        Q.    You didn't have to check

15   titles in the rent-to-own business

16   did you?

17        A.    No, sir.

18        Q.    And you had to receive

19   training in all of those elements of

20   your new job, correct, because you

21   didn't know about those things?

22        A.    Yes.  I've worked with

23   Alabama Title Loans prior to.

262

1        Q.    All right.  But you still
2    received training at TitleMax?
3        A.    Yes.  Yes.
4        Q.    And then in paragraph 19,
5    you talk about insufficient training
6    and how you were able to build on
7    your prior experience in the
8    rent-to-own business and your
9    experience with Alabama Title Loans.
10   How did your rent-to-own business
11   experience help you in the title
12   business at TitleMax?
13       A.    With the collection
14   experience, sales experience.  Just
15   the general public, you know, dealing
16   with the general public.
17       Q.    Okay.  In paragraph 29
18   through 31, it says plaintiff made
19   numerous requests of Berry for a pay
20   raise.  Berry denied each of
21   plaintiff's requests.  Were these
22   requests made orally or in writing?
23       A.    There was one made via

```
 1          A.    No, sir.

 2          Q.    How did this effect the

 3   fact that you weren't given a written

 4   guideline as to how you -- and I'm

 5   assuming what you mean by that is

 6   what's satisfactory and

 7   unsatisfactory?

 8               MS. WOODHAM:   Objection.

 9          Q.    (BY MR. MULROY):   Like a

10   grade?  Is that what you're talking

11   about?

12          A.    Yes.

13          Q.    Okay.  How did that impact

14   your pay or any other material

15   condition of your terms of

16   employment?  In other words, did

17   these audits effect your pay benefits

18   to your knowledge?

19          A.    Not to my knowledge.  No.

20          Q.    And you went over these

21   audits with the same guy every week,

22   every two weeks just about?

23          A.    That's correct.
```

268

1          Q.    Okay.   And it would change

2    only when the district manager would

3    change?

4          A.    That's correct.

5          Q.    The purpose of the audits

6    was to give training to managers,

7    correct?

8                MS. WOODHAM:   Objection.

9          A.    That's correct.

10         Q.    (BY MR. MULROY):   And that

11   was emphasized many times to you that

12   the purpose of an audit was a

13   training mechanism?

14         A.    Yes.

15         Q.    Okay.   So in addition to

16   the training you received in that

17   first month, every time, every two

18   weeks a manager would come in with

19   the audit checklist and tell you how

20   the things they felt were going and

21   how they should be improved, correct?

22         A.    Yes.

23         Q.    Okay.   You had the human

1    Q.    Okay.  What did Mr. Deal
2   tell you when you were demoted?

3    A.    That he just wanted to make
4   a change.

5    Q.    Who's your district
6   manager, Mr. Knight?

7    A.    Michael Knight.

8    Q.    What did Michael Knight
9   tell you about --

10    A.    That I needed more
11   training.

12    Q.    Okay.  And you went to
13   another store as an assistant
14   manager, correct?

15    A.    That's correct.

16    Q.    Did either of them mention
17   anything about the customer
18   complaints as being a reason for your
19   demotion?

20    A.    Not to me.  No.

21    Q.    Okay.  To anybody?

22    A.    I don't know.

23    Q.    But as we sit here today,

272

1    you have no knowledge that either of

2    the two decision makers ever said

3    anything about the customer

4    complaints as being a reason for your

5    demotion?

6         A.    Not to me.  No.

7         Q.    Okay.  And not to anybody

8    that you know?

9         A.    No.

10        Q.    Okay.  And sitting here

11   today, the two decision makers made

12   no racial slurs to your knowledge,

13   correct?

14        A.    No.

15        Q.    Nor did Mr. Knight?  Was he

16   privy to the conversation that

17   allegedly happened between Mr.

18   Bozeman -- I'm sorry -- Mr. Cox and

19   Mr. Perry, correct?

20        A.    Berry?

21        Q.    I'm sorry.  Did I say it

22   wrong, Jim Berry?  Jim Berry.

23        A.    I'm sorry.  Repeat that?

273

```
 1            MS. WOODHAM:   Objection.
 2        Q.   (BY MR. MULROY):
 3    Mr. Knight wasn't involved in the
 4    conversation to your knowledge
 5    between Cox and Berry, correct?  That
 6    was just Cox and Berry on the phone?
 7        A.   To my knowledge.
 8        Q.   And Berry was long since
 9    gone as your district manager when
10    you were demoted, correct?
11            MS. WOODHAM:   Objection.
12        Q.   (BY MR. MULROY):  Some nine
13    months earlier, correct?
14            MS. WOODHAM:   Objection.
15        A.   I don't remember how many
16    months.
17        Q.   (BY MR. MULROY):  Does nine
18    months sound about right?
19        A.   I don't know.
20        Q.   Okay.  One of the
21    allegations you make is that you were
22    retaliated against.  Can you tell me
23    how you were retaliated against?
```

1      A.      There was a time in the --
2    I was having something done here at
3    the hospital and Jack sent out an
4    e-mail saying that our prayers and
5    thoughts go out to Mr. Nemo
6    concerning his condition.  And he
7    received a phone call from Dave Deal
8    telling him that Steve Nemo has the
9    company in a lawsuit and we should
10   never give him that kind of
11   attention.
12      Q.    How do you know that?
13      A.    Jack Bozeman told me.  Dave
14   Deal's cell phone number was on the
15   Caller ID that same day.
16      Q.    Okay.  It was not an
17   e-mail, it was a cell phone call?
18      A.    That he had got.  Yes.
19   That Dave Deal replied with.  Yes.
20   It was a cell phone call.
21      Q.    Okay.  And how did that
22   impact any of your pay benefits or
23   other terms and conditions of

275

1    employment?

2        A.    Well, it didn't.

3        Q.    Okay.  Any other ways you

4    were retaliated against?

5        A.    Well, the time when Michael

6    -- I mean David Cox told me if I

7    dropped the lawsuit that they might

8    make me a manager.

9        Q.    What was Cox's position at

10   the time?

11       A.    Manager.

12       Q.    Okay.  And we've

13   established this earlier your

14   testimony that he had no authority to

15   promote anybody, correct?

16       A.    That's correct.

17       Q.    Okay.  That happens,

18   promotions happen between the

19   district manager and the regional

20   manager, correct?

21       A.    Well, you get the manager's

22   input because you're working close,

23   the assistant manager is working

276

1    close with the manager, so you get

2    the manager's input on who a person

3    can be considered for a promotion.

4         Q.    But it's the district

5    manager and the regional manager that

6    makes the decision on promotions,

7    correct?

8         A.    The regional manager makes

9    the ultimate decision.

10        Q.    Okay.  Any other ways you

11   were retaliated against?

12        A.    No.

13        Q.    Who is it that you allege

14   that was negligently retained by the

15   company?

16             MS. WOODHAM:  Objection.

17        A.    I'm sorry?  I don't

18   understand.

19        Q.    (BY MR. MULROY):  In your

20   mind who should have been fired that

21   wasn't?  Is there somebody that

22   should have been fired at the company

23   for something they did to you?

277

1       A.     Something they did to me?

2   No, sir.  I have no idea.

3       Q.     Have you done a calculation

4   of how much the company owes you

5   because of this or you believe the

6   company owes you?

7       A.     No, sir.  I haven't

8   discussed that with my attorney yet.

9       Q.     Okay.  What pay have you

10  lost?

11      A.     There again I would have to

12  discuss it with my attorney.

13      Q.     Okay.  You've been paid the

14  same as you were as a manager?

15      A.     Yes.

16      Q.     Except for apparently the

17  cell phone you don't get anymore?

18      A.     Right.  And the insurance

19  reimbursement.

20      Q.     Okay.  And the insurance

21  reimbursement is $200.00 a month?

22      A.     Yes.

23      Q.     And the cell phone was

1      $40.00 a month?

2          A.    Yes.

3          Q.    The purpose of doing that

4      is because you used the cell phone in

5      business, correct?

6          A.    That's correct.

7          Q.    Do you currently use a cell

8      phone in business?

9          A.    No, sir.

10         Q.    Let me meet with my client.

11     I'm about finished, I think.

12

13               (Whereupon, a brief

14                recess was taken

15                in the deposition.)

16

17         Q.    (BY MR. MULROY):  Did you

18     know that you are currently eligible

19     to get insurance reimbursement?

20         A.    Yes.

21         Q.    Okay.  And have you elected

22     to get insurance reimbursement?

23         A.    Yes.

285

1         A.    No, sir.

2         Q.    And you never called Dave

3    Deal and said, hey, there's something

4    wrong with the hot line, correct?

5         A.    No.

6         Q.    And you never uttered these

7    words to anybody, a lot of these

8    racial slurs, to anybody until today

9    when we get to the deposition,

10   correct?

11              MS. WOODHAM:   Objection.

12        A.    There were other employees

13   present when the slurs were being

14   made.

15        Q.    (BY MR. MULROY):   That

16   being who?

17        A.    Jack Bozeman.

18        Q.    Okay.  But you didn't hear

19   that one, right?  You weren't present

20   when that was said?

21        A.    No.  Not when he spoke

22   derogatory about me.  No.  I wasn't

23   present.

1        Q.    And you never told the EEOC

2    or any investigation agency that

3    David Cox used racial slurs with you

4    in your presence, correct?

5        A.    No, sir.

6        Q.    The first time that that

7    has been mentioned by you is today at

8    the deposition, correct?

9        A.    Yes, sir.

10       Q.    Okay.  That's all the

11   questions I've got.

12            MS. WOODHAM:  No questions.

13            FURTHER THE DEPONENT SAITH

14   NOT.

15

16

17

18

19

20

21

22

23

District # 5    James Berry    Payperiod: 12/01/03

| Check Order | Store | Employee Name | Title | Status | Start Date | Comments | Starting Salary | Annual Current Sal | 401K contribution | Semi Monthly Salary | Guaranteed Bonus | Bonus | Child Support/Garnishment | Ins. Reimb | Paid Time Off Accrued Days 1 | Paid Time Off Days Used | Paid Time Off Days Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALMO1 | MONG1* | Jessica A Medley | Manager | 1 | 02/07/01 | | 30,000.00 | 30,000.00 | | 1,250.00 | | | | 160.00 | 9 | 9 | 0 |
| ALMO1 | MONG1 | Gary Hill | Asst | 1 | 10/16/03 | | 23,920.00 | 23,920.00 | | | | | | | 1 | 0 | 1 |
| ALMO1 | MONG1 | Dan Taylor Jr | On Mgr | 1 | 06/16/01 | Terminated 11/14/03 no pay | 28,000.00 | 28,000.00 | | | | | | | 10 | 6 | 4 |
| ALMO1 | MONG1 | Teresa McCall | Collector | 1 | 07/07/03 | | 20,800.00 | 20,800.00 | | | | | | | 4 | 0 | 4 |
| ALMO2 | MONG2* | Wanda Y Asberry | Manager | 1 | 08/30/01 | | 28,000.00 | 30,000.00 | -20.00 | 1,250.00 | | | | 200.00 | 8 | 6 | 2 |
| ALMO2 | MONG2 | Jermaine McCall | On mgr | 1 | 07/01/03 | | 28,000.00 | 28,000.00 | | 1,166.67 | | | | 124.38 | 4 | 0 | 4 |
| ALMO2 | MONTG2* | Kirk Bennett | Asst | 1 | 09/24/03 | | 20,800.00 | 20,800.00 | | 866.67 | | | | | 1 | 0 | 1 |
| ALMO3 | MONTG3* | Eddie Hoskin | Manager | 1 | 12/03/02 | | 20,800.00 | 28,000.00 | | 1,166.67 | | | | 172.00 | 10 | 6 | 4 |
| ALMO3 | MONTG3* | Kirk Boswell | Asst | 1 | 09/24/03 | | 20,800.00 | 20,800.00 | | 896.67 | | | | | 4 | 4 | 1 |
| ALMON | MONTU | Shane Cahelan | Manager | 1 | 07/15/02 | | 30,000.00 | 30,000.00 | | 1,250.00 | | | | | 10 | 4 | 6 |
| ALMON | MONTU | Scott Seay | Asst | 1 | 09/03/03 | | 20,800.00 | 20,800.00 | | 866.67 | | | | | | 4 | |
| ALMON | MONTU | Jason Jackson | Asst | 1 | 10/16/03 | | 23,920.00 | 23,920.00 | | 996.67 | | | | | | | |
| ALMO1 | MONGUS2 | Hillard Williams | On mgr | 1 | 05/15/03 | | 30,000.00 | 30,000.00 | | 1,250.00 | | | | | 8 | 0 | 8 |
| ALMGT | MONGUS3 | Steve Nemo | Manager | 1 | 01/18/02 | | 28,000.00 | 28,000.00 | | 1,083.33 | | | 225.50 | 200.00 | 10 | 6 | 4 |
| ALPRA | PRATV | David Cox | Manager | 1 | 11/20/02 | | 28,000.00 | 28,000.00 | | 1,250.00 | | | | | 10 | 3 | 7 |
| ALPRA | PRATV | Jack Bozeman Jr | Asstant | 1 | 05/07/01 | | 20,800.00 | 22,880.00 | no | 953.33 | | | 117.50 | 172.00 | 10 | 8 | 2 |
| ALMGT | PRATV US | Jose Asberry | On mgr | 1 | 08/15/03 | | 30,000.00 | 30,000.00 | | 1,250.00 | | | | | 2 | 0 | 2 |
| ALSEL | SELMA | Michael Myatt | Asstant | 1 | 02/01/02 | | 22,880.00 | 22,880.00 | 18.42 | 953.33 | | | | | 10 | 10 | 0 |
| ALSE | SELMA | Henry D Easley | Manager | 1 | 04/22/02 | | 30,000.00 | 30,000.00 | | 1,250.00 | | | 227.50 | 150.00 | 10 | 3 | 7 |
| ALWEMP | Wetumpka | Steven Crawford | On mgr | 1 | 05/05/03 | | 28,000.00 | 28,000.00 | | 1,083.33 | | | | 200.00 | 6 | 0 | 6 |
| ALWEMP | Wetumpka | Steven Cahelan | Mgr | 1 | 12/21/02 | | 30,000.00 | 30,000.00 | 50.00 | 1,250.00 | 400.00 | | | 164.00 | 10 | 8 | 2 |

Approved By: _____



DEFENDANT'S EXHIBIT

00 001

# EMPLOYEE WARNING NOTICE



DEFENDANT EXHIBIT Nemo 2

**EMPLOYEE**
STEVE NEMD

**EMPLOYEE NO.**
-63-

**DEPARTMENT**

**WARNING DATE** 12/05/2003

**SHIFT**

## VIOLATIONS

- ☐ ATTENDANCE
- ☐ CARELESSNESS
- ☐ CONDUCT
- ☐ INSUBORDINATION
- ☐ PERSONAL WORK
- ☐ REFUSAL TO WORK OVERTIME
- ☐ SAFETY
- ☐ TARDINESS
- ☐ UNAUTHORIZED ABSENCE
- ☐ WORK QUALITY
- ☐ WILLFUL DAMAGE TO COMPANY PROPERTY
- ☒ OTHER _Policy_

## WARNINGS PREVIOUSLY

| WARNING # | DATE | ORAL | WRITTEN | SIGNED |
|-----------|------|------|---------|--------|
| 1 | 12/5/3 | | X | |
| 2 | | | | |
| 3 | | | | |

## COMPANY STATEMENT

It has been Discovered THAT YOU HAVE ON MORE THAN ONE OCCASION violated company Policy By Modifying our ~~Personal Interests.~~ ADDITIONALLY MANY CUSTOMERS WE ALLEGED THAT YOU ADVISED THEM THEY DIDN'T HAVE TO WORRY ABOUT BEING ON TIME THAT YOU WOULD WORK WITH THEM. YOU ARE HEREBY ADVISED THAT OUR INTEREST FREE Policy IS NOT SUBJECT TO MODIFICATION WITHOUT APPROPRIATE AUTHORIZATION. ALL PAWNS ARE 30 DAYS IN DURATION AND DUE ON DUE DATE RECORDED NO EXCEPTIONS. No FUTURE INCIDENTS OF THIS NATURE WILL BE TOLERATED.

SIGNED _James Berry_ ( SEE REVERSE)

TITLE _District Manager_    DATE 12/4/2003

## EMPLOYEE STATEMENT

- ☐ I agree with Company Statement.
- ☒ I disagree with Company Statement.

**REASONS**
I disagree with the statement of trying to Accommodate my personal interest, and that I advised customers that they didn't have to worry about being on time that is work

SIGNED    DATE / /

## ACTION TAKEN

have read this Warning Notice and understand it.

EMPLOYEE'S SIGNATURE _[signature]_    DATE 12/5/3

SUPERVISOR _James Berry_    DATE 12/5/3

☐ This form was refused by Employee

SUPERVISOR    DATE

The Employee Warning Notice, after completion, contains information on the medical condition or history of an employee, then be maintained in a separate medical file and treated as confidential in accordance with applicable law and regulations

00 002

Company Statement Continued:

If you do not understand any policies our your authority and parameters contact your District Manager.

You are further advised that it is imperative that you control your customers, do not let them control you.

James Berry
District Manager

work with them. I only thought that I was working within the premises of company policy.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| X | EEOC | 130-2004-04489 |

and EEOC

_____
State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Steve Jerome Nemo | (334) 358-9131 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | Date of Birth |
|---|---|---|
| 1715 County Rd. 21 North | Prattville, AL 36067 | 09/19/1964 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Title Max | 15 | (334) 358-6227 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 215 South Memorial Dr. | Prattville, AL 36067 | Autauga |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] AGE
[ ] RETALIATION  [ ] NATIONAL ORIGIN  [ ] DISABILITY  [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL)
09/07/2004

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am an African-American male and have been employed for approximately three years as a manager. On Sept. 7, 2004, I was demoted to assistant manager and moved to a different location. My replacement is Kelvin Godwin, Caucasian male, who has not worked but for a few months with the company. He also began with a salary more than my beginning salary. I am capable of handling the manager's position. This adverse employment action has damaged me considerably. I have lost insurance benefits costing me about $200/month. I lost cell phone privileges given to managers only. I lost potential bonuses of approximately $250+ each month. This action against me is one of many actions against African-American employees. The company is consistently replacing African-American managers with Caucasians. Any reason given for this demotion is pretext. I believe that I am a victim of race discrimination in violation of Title VII. I have hired an attorney, Kathryn Dickey, located at 322 Alabama Street, Montgomery, AL 36104 and her telephone number is 334-262-0728.

RECEIVED
2 7 200
E.E.O.C.
DISTRICT

DEFENDANT'S EXHIBIT

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - When necessary for State and Local Requirements) |
|---|---|
| | Darlene Clark |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| _Steve Nemo (signature)_ | |